**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JENS SOERING,
<u>Petitioner-Appellant,</u>

v.

No. 99-6498

GEORGE DEEDS, Warden, Keen
Mountain Correctional Center,
<u>Respondent-Appellee.</u>

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-98-361-R)

Argued: June 8, 2000

Decided: June 30, 2000

Before WILKINS and LUTTIG, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Gail Starling Marshall, Rapidan, Virginia, for Appellant.
John H. McLees, Jr., Senior Assistant Attorney General, OFFICE OF
THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.
**ON BRIEF:** Mark L. Earley, Attorney General of Virginia, OFFICE

OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Petitioner-appellant Jens Soering appeals from the district court's denial of his application under 28 U.S.C. § 2254 for a writ of habeas corpus. Soering claims, inter alia, that several of his confessions were obtained in violation of Edwards v. Arizona, 451 U.S. 477 (1981), and that the prosecution withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Because we conclude that the district court correctly upheld the Supreme Court of Virginia's rejection of these and other claims advanced by Soering, we affirm the district court's judgment denying Soering's application for a writ of habeas corpus.

I.

Soering was sentenced in 1990, in accordance with the jury's recommendations, to two consecutive terms of life imprisonment for the murders of Derek and Nancy Haysom. Five years earlier, the corpses of the Haysoms were found in their home, with their throats slashed and their torsos penetrated with multiple stab wounds. J.A. 1233-34; 1240-42 (autopsy reports). Soering, a German citizen, confessed to these murders in detail on several occasions following his arrest in England on unrelated check-fraud charges; he explained how he and Elizabeth Haysom, the victims' daughter and Soering's former girlfriend, arranged for Elizabeth to provide him with an alibi while he killed her parents, and he demonstrated to authorities the manner in which he severed the main artery in each of his victim's necks. See, e.g., J.A. 154-58, 168, 847-48. Soering's account of how he struggled

2

with and then killed the Haysoms was consistent with the deep facial bruise and the bandages to his left-hand fingers that he was seen with at the Haysoms' funeral. J.A. 877. Moreover, Soering's blood was of the same type as the unidentified blood found at the crime scene. J.A. 933, 944.

On direct review, both the Virginia Court of Appeals and the Supreme Court of Virginia denied Soering's petition for an appeal from his convictions and sentences for first-degree murder. On state collateral review, the Supreme Court of Virginia denied his petition for a writ of habeas corpus, after first remanding his Brady claim for an evidentiary hearing. Soering then filed an application for a writ of habeas corpus in federal district court, pursuant to 28 U.S.C. § 2254. The district court denied Soering's application and subsequently denied his motion to alter or amend its judgment.

II.

Applying the standard of review set forth by the Supreme Court in Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000), we consider whether the Supreme Court of Virginia's rejection of Soering's claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

A.

Soering first argues that the district court erred in upholding the Supreme Court of Virginia's rejection of his claim that his confessions in England were obtained in violation of Edwards v. Arizona, 451 U.S. 477 (1981). Under Edwards,

> an accused [. . .], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

3

451 U.S. at 484. Specifically, Soering contends that, even though he expressed his desire to deal with the police only through counsel at the end of his second interview, he was subjected to further interrogation a few hours later by a Virginia law-enforcement officer (Investigator Gardner) and his British counterparts. Soering argues that, because any self-incriminating statements that he made during the third and subsequent interviews should have therefore been suppressed, the trial court's failure to do so entitles him to habeas relief.

We conclude that the district court correctly upheld the Supreme Court of Virginia's rejection of Soering's Edwards claim because, even assuming that Edwards applies to an American law-enforcement officer's interrogation of a German citizen in British custody we cannot say that Edwards was actually violated at all: Soering has simply failed to "rebut[ ]," "by clear and convincing evidence," "the presumption of correctness" that we must accord to the state trial court's factual finding that Soering himself "initiated" the third and subsequent interviews with the police, § 2254(e)(1); J.A. 480.* Soering offers nothing more than sheer speculation about whether the police orchestrated or pressured him into initiating further contact with them after his second interview. See, e.g. , Appellant's Br. at 43-44. And there is strong support in the record for the state court's factual finding that Soering himself initiated further communication with the police. First, after being taken back to his cell, Soering asked one of the jail guards to inform Detective Constable Wright, who had participated in Gardner's earlier questioning of Soering, that he wished to speak to Gardner again. J.A. 609. Second, six minutes before the third interview began, Soering signed the following entry in the custody log at the British police station where he was being held: "I now wish to speak to D/S Beever, D/C Wright, D/C Gardner without my solicitor being present." J.A. 609, 633, 1562. Soering therefore clearly indicated that, regardless of what had transpired beforehand, he was

_____

*The district court held that, under United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), it was clearly established that Edwards applies to custodial interrogations by American law-enforcement officers of foreign citizens in foreign custody in foreign lands. J.A. 1556. Given our disposition infra, we need not address the question whether Edwards does in fact govern custodial interrogations by American law-enforcement officers of foreign citizens in foreign custody in foreign lands.

4

"now," at that point in time, initiating contact with the police. And in doing so, he in no way indicated that he wished to discuss only the British check-fraud charges, rather than the Haysom murders, about which Beever, Wright, and Gardner had interviewed him earlier that day. Third, Soering's statements during the ensuing interview "reflect[ed] no unwillingness to talk or any other reason to believe that he was taken from his cell against his will and at the instance of law enforcement officers"; moreover, Soering made no reference whatsoever to the British check-fraud charges during this interview, which confirms that he did not wish to discuss only those charges. J.A. 1563; 151-90.

Even if the Supreme Court of Virginia's rejection of Soering's Edwards claim was "contrary to," or "an unreasonable application of," Edwards, Soering would still not be entitled to habeas relief on this ground, since Soering has failed to show that the admission of his confessions made in England "had [a] substantial and injurious effect or influence in determining the jury's verdict," thereby causing him "actual prejudice," Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Soering did not suffer "actual prejudice" because the jury in all likelihood would have reached the same verdict that it did in reliance on Soering's subsequent, voluntary, counseled confession to a German prosecutor, which Soering does not challenge as being improperly admitted at trial, and which contained many of the same incriminating details that his confessions in England did. See , e.g., J.A. 1034-35 ("the next thing that I can remember is that I stood behind Mr. Haysom, and then blood ran from his neck into his lap. . . . I stood there with a knife in my hand. . . . I don't know whether I stabbed him in the neck or cut down along the neck. . . . Prosecutor: Diagonal cut through the artery? The defendant [Soering]: Yes, that was it."); J.A. 1038 ("finally I injured Mrs. Haysom, too, at her neck"); J.A. 1046 ("I can remember that I caused both of them neck wounds.").

B.

Soering next argues that the district court erred in upholding the Supreme Court of Virginia's rejection of his claim that material exculpatory evidence was withheld from him by the prosecution in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, Soering contends that the Virginia court's decision was "contrary to,"

5

and "an unreasonable application of," Brady because there is a "reasonable probability" that the outcome at trial would have been different, Kyles v. Whitley, 514 U.S. 419, 434 (1995), if the prosecution had disclosed to Soering evidence that, within a week of the Haysom murders, a sheriff's deputy briefly detained two vagrants, Shifflett and Albright, who were later convicted of murdering Milliken, another vagrant. Such evidence, Soering argues, would have bolstered his defense that the Haysoms were murdered not by him, but rather, by Elizabeth Haysom, assisted by one or two accomplices.

We conclude that the district court correctly upheld the Supreme Court of Virginia's rejection of Soering's Brady claim because the evidence in question is not material for purposes of Brady. The Supreme Court of Virginia did not unreasonably apply Kyles in holding that there is no "reasonable probability" that "the result of the proceeding would have been different" had the prosecution disclosed to Soering the evidence concerning Shifflett and Albright, Soering v. Deeds, 499 S.E.2d 514, 517 (Va. 1998) (quoting, inter alia, Kyles, 514 U.S. at 435). First, the only relationship between the Haysom and the Milliken murders was that they occurred in the same county within six days of each other, and both were carried out with a knife. There is no evidence whatsoever that either Shifflett or Albright had ever met, or knew of, Elizabeth Haysom or her parents, nor is there any physical evidence connecting Shifflett or Albright to the Haysom murders. Second, it is highly unlikely that Shifflett and Albright, who murdered another vagrant to rob him of his empty wallet, murdered the Haysoms, since robbery was patently not the motive behind the Haysom murders: silverware, jewelry, $122 in cash, the automobile parked outside and the keys thereto, a television, stereo equipment, and other valuable items that were in plain view were left behind after the Haysoms were murdered. J.A. 1269, 1273, 1281-83, 694, 690-91. Third, the manner in which Milliken and the Haysoms were murdered differed markedly: Milliken's throat was stabbed, not slashed, as was the case with the Haysoms, and thus Milliken died slowly, unlike the Haysoms; moreover, the Haysoms were not sexually mutilated, as was Milliken. Compare J.A. 1243-49 with J.A. 1226-42; see also J.A. 1191. Fourth, it is far from clear that the knife that the deputy found buried in the back seat of his patrol car one week after he detained Shifflett and Albright, and that Soering now alleges was used by Shifflett and Albright to murder the Haysoms, even belonged to the two

6

vagrants, since the deputy could not recall when he had last checked his back seat prior to detaining Shifflett and Albright. J.A. 1120. Fifth, the knife was a very common kind of folding knife, readily available at retail stores. J.A. 1189. Sixth, even if the knife did belong to Shifflett and Albright, there were no traces of blood on it, and although the blade was "consistent with the size and shape of [the] weapon that could have caused the wounds to [the Haysoms]," the medical examiner explained that he could not determine the precise dimensions of the blade actually used to cause the Haysoms' wounds. J.A. 1187-88, 1186; see also Soering, 499 S.E.2d at 516. In light of the foregoing, we cannot say that the Supreme Court of Virginia's rejection of Soering's Brady claim was "contrary to," or "an unreasonable application of," Brady or Kyles.

C.

Finally, Soering raises a number of ineffective-assistance-of-counsel claims, all of which were rejected by the Supreme Court of Virginia. We agree with the district court that the Virginia court's rejection of these claims likewise was not "contrary to," or "an unreasonable application of," Strickland v. Washington, 466 U.S. 668 (1984).

First, Soering argues that counsel was constitutionally ineffective in failing to object to the prosecutor's comments to the jury about Soering's refusal to submit blood and hair samples, footprints, and fingerprints to the authorities when he was asked to do so. We conclude that counsel's failure to object did not "f[a]ll below an objective standard of reasonableness," Strickland, 466 U.S. at 688, not only because counsel may have made a tactical decision not to draw the jury's attention to such comments by objecting, but also because, in South Dakota v. Neville, 459 U.S. 553 (1983), the Supreme Court upheld the constitutionality of a state law permitting the admission into evidence of a defendant's refusal to submit to a blood-alcohol test, see id. at 918, 923. Soering counters that Neville is distinguishable because in Neville, unlike in the present case, the police had probable cause prior to requesting a blood sample from the defendant, and thus the prosecutor's comments did not burden the defendant's Fourth Amendment right to refuse unreasonable searches of his body. Thus, Soering argues, counsel could have successfully objected to the

7

prosecutor's comments by arguing for an extension of Griffin v. California, 380 U.S. 609 (1965), which held that a prosecutor's or trial court's comments on a defendant's refusal to take the witness stand impermissibly burdened the defendant's Fifth Amendment right to refuse to testify, see id. at 615. We doubt that such an argument could have succeeded because, even if the trial court were willing to extend Griffin to prohibit prosecutors from commenting on a defendant's refusal to consent to searches unsupported by probable cause, the prosecutor's comments would have still been permissible as a means of impeaching Soering's credibility, since Soering testified on his own behalf. See Portuondo v. Agard, 120 S. Ct. 1119, 1125 (2000) (limiting Griffin to "comments that suggest [that] a defendant's silence is [substantive] evidence of guilt" (internal quotation marks omitted)). In any event, we cannot say that Soering was prejudiced within the meaning of Strickland. See infra.

Second, Soering contends that counsel was constitutionally ineffective in failing to preserve an objection to the trial court's refusal to instruct the jury on the crime of being an accessory-after-the-fact. Counsel was not ineffective because under Virginia law, Soering was not entitled to an accessory-after-the-fact instruction at all, since he was not charged with being an accessory-after-the-fact. See Commonwealth v. Dalton, 524 S.E.2d 860, 863 (Va. 2000); Indictments of Jens Soering (June 13, 1986). Counsel was also not ineffective because the trial court was entitled to insist, as it did, on giving an accessory-after-the-fact instruction only if an accessory-before-the-fact instruction was also given. Soering argues that the trial court was not entitled to so insist because, under Virginia law, there was insufficient evidence to support an accessory-before-the-fact instruction. However, there was ample evidence from which the jury could have concluded that Soering participated as an accessory-before-the-fact in planning the murders of the Haysoms. See, e.g., J.A. 998 (Elizabeth Haysom's testimony that on the morning of the murders, Soering bought a knife from a sporting goods store with some money that Elizabeth had just given him); J.A. 1056 (Soering's testimony that he bought two movie tickets and ordered room service for two on the evening of the murders in order to produce an alibi for Elizabeth). Even if Soering were entitled to an accessory after-the-fact instruction, he was not prejudiced by counsel's failure to preserve an objection to the trial court's refusal to give such an instruction, given the

8

overwhelming evidence that he personally killed the Haysoms. <u>See infra</u>.

Third, Soering argues that counsel was constitutionally ineffective in failing to present more evidence to rebut the prosecution's contention that the bloody sockprint found at the scene of the crime was Soering's. Counsel's performance was not objectively deficient nor was Soering prejudiced, since counsel effectively cross-examined one of the prosecution's witnesses about his failure to compare Elizabeth Haysom's foot impressions with the sockprint, and since counsel demonstrated to the jury during closing argument "how one of Elizabeth's foot impressions matched the sock print almost as well as petitioner's [did]." J.A. 969, 1572; <u>see also</u> J.A. 1076 (counsel reminds the jury during closing argument that the shoe prints found at the crime scene were similar in size to Elizabeth's shoes).

Finally, Soering argues that his rights under <u>Strickland</u> were abridged because his lead trial counsel, who has since been disbarred, was emotionally and mentally troubled at the time of the trial. However, we conclude that the Supreme Court of Virginia's rejection of this claim was not an unreasonable application of <u>Strickland</u>, not only because lead trial counsel did not perform below an objective standard of reasonableness, but also because Soering was not prejudiced, since local co-counsel was of sound mind and represented Soering competently.

Even considering all of the alleged instances of ineffective assistance of counsel cumulatively, we cannot say that Soering was prejudiced within the meaning of <u>Strickland</u>, given the overwhelming evidence of his guilt. Soering's confessions to American, British, and German officials recounted in detail how he and Elizabeth planned the murders and how he then carried them out. <u>See</u>, <u>e.g.</u>, J.A. 154-58, 168, 847-48. These accounts of how he struggled with and then slaughtered the Haysoms were consistent with the deep facial bruise and the bandages to his left-hand fingers that he was seen with at the Haysoms' funeral. J.A. 877. And Soering's blood was of the same type as the unidentified blood found at the crime scene. J.A. 933, 944. Given these facts, we cannot say that, "but for counsel's unprofessional errors, the result of the proceeding would have been different,"

9

and thus we cannot say that Soering was prejudiced, <u>Strickland</u>, 466 U.S. at 694.

<u>CONCLUSION</u>

For the reasons stated herein, we affirm the district court's judgment denying Jens Soering's application for a writ of habeas corpus.

<u>AFFIRMED</u>

10